The judgment of the court was pronounced by
Preston, J.
This is in effect a suit against the United States for that large and valuable square of ground in front of the city, on which the United States Mint is established and for its rents and profits since the year 1819.
Our predecessors, after an elaborate and able argument, determined that it was one of those cases in which the officers of the General Government might be sued for property in their possession claimed by the Government, and in which the officers had no interest. If we had the right to review the decision in this case, we do not find it necessary. Besides there is a party on record, in relation to whose rights it is imperative on us to decide, to wit, the First Municipality of New Orleans, called in warranty by the officers of the United States. The Municipality has appeared by her counsel, and joined in the defence of the title, under which the premises are occupied by the United States.
The plaintiffs, who are very numerous, declare that they are the descendants and heirs of Claude Joseph Dubreuil Pillars, who died in this city in the year 1757; that the ground in controversy was a portion of a plantation which belonged to him before his death, of which two arpents and twelve toises front on the river, embracing this square, was never alienated by his heirs or representatives.
On the hearing of this cause, the plaintiffs’ counsel observed that the presumption was in favor of the validity of plaintiffs’ title, because the judge of the district court had found it necessary to employ fifty printed pages to support his opinion adverse to the title. The district judge might indeed have summarily stated two or three leading facts, fully established by the evidence as fatal to the plaintiffs’ suit, and rendered'judgment against them. But it was far more satisfactory to public justice, and should be to both parties, for that tribunal to have examined with care every document and all the oral testimony introduced in evidence, and which had accumulated for a centuxy, and to show from all a total want of title in the plaintiffs, and a complete and pei'fect title in the defendants. He has done so with great ability and extraordinaiy cai'e and labor, and the accuracy of his detail of facts and conclusions from them cannot be too much applauded by this court.
After hearing the case fully argued on behalf of plaintiffs’ counsel, we deemed it unnecessary to hear the counsel of the defendants, believing that none of the conclusions of the district court had been successfully assailed, and with a few general observations, we will condense and adopt the reasons given for the judgment of the distx-ict court as our own.
It will be seen by the 35th chapter of the book of Numbers, and the 21st of the book of Joshua, that the children of Israel were commanded with great particularity in founding cities for emigrating tribes, to lay off extensive subui'bs outside of the walls, for the common use of the inhabitants. The Christian sovereigns of Europe, either fxuixi'a reverence for the example or the intrinsic utility of the custom, incoi'porated it into their laws for the government of their Colonies in the Indies. By the term city, in Spanish jui’ispi'udence, was undexstood a place surrounded by walls. 7 Part, title 33, law 6. And by the laws of the Indies, it was expressly provided, that no houses should be erected within the distance of three hundred paces froin the walls or breastworks of the town, this being necessaxy for the good of our service and for the safety and defence of the towns. See the Laws of the Indies, book 4, title 7, law 12; or White’s New Recopelacion, vol. 2, p. 47.
*726 In Merlin, verbo, Fortification, vol. 12, Brussell’s Edition of 1826, it will be seen that by an ordinance of the King of France, dated the 24th of September, 1678, ramparts, ditches, and other places which had served for the fortifications of the cities of the kingdom could not be alienated by his officers, because they were things out of commerce and belonged to the king. It will be seen further, under the word Communaux, that cities could not alienate their commons, and in the collection of the laws and ordinances of the Colonies by Moreau de Saint Mery, he gives some striking cases, in which even public officers had attempted to locate themselves pei'manently on places destined to public purposes, in which their pretensions were rejected, having, as expressed in one decree, the shame of having speculated without profit upon an object, the destination of which rendered it worthy of the protection of the colonial laws. See his work, p. 262 and 309.
The City of New Orleans was founded by Governor Bienville about the year 1718. A copy of a plan which the city has obtained from the Minister of Marine, and Colonies in France, made by the Engineer de Lassas in 1726 exhibits the city and its environs. The first concession of land below the city is exhibited as made to one Dreux. By the scale of the map its upper line is more than half a mile below the city; and all the intervening space is marked on that early plan as commons of the city.
That the King of France might subsequently grant these commons to individuals we have no doubt; and that they were granted to individuals to the distance of within two arpents and twelve toises of Barracks street, the plaintiffs’ counsel have rendered probable.
For although they alleged that the square claimed by them was a portion of a tract of land belonging to their ancestor, called his Brewery, yet when the defendants, with uncommon industry and at great expense, traced the titles and location of that tract, and demonstrated that the upper line of the Brewery Plantation was a quarter of a mile below the square in controversy, and that plaintiffs’ ancestor had alienated that tract years before his death, the court allowed them to show that their ancestor owned another tract of land nearer the city, of which they contend the square in controversy was a portion. They showed neither grant nor title to this last tract; but a sale of the Brewery Plantation on the 5th of October, 1758, is in evidence, describing it as lying about a quarter of a league below the city, and bounded on the upper side by land belonging to the succession of Dubreuil Villars; and a month afterwards, on the 4th of November, 1758, a public sale of the land belonging to the succession was made, the plaintiffs contend, with a front of seven arpents and eighteen toises, embracing the square in controversy and if from these acts we may infer a grant, the question is, whether seven arpents and eighteen toises were granted, and if so, did they embrace the square for which the suit is brought ?
It is ascertained beyond a doubt that the city of New Orleans was fortified by Governor Bienville, by whom it was founded. A military governor of a feeble Colony, surrounded by numerous savages, actually at war with the powerful tribe of Chickasaws and also the Natchez, could not do otherwise than fortify his capilol. That the city was fortified at its foundation, and an esplanade left outside for the use of the fortifications, is rendered certain by a grant made in 1724 to one De Chavannes, the Secretary of the Western Company, of two arpents above the Brewery, on the condition that it could be found at the distance prescribed by the ordinances from the esplanade of the city. In 1725 he had the grant made absolute; the engineer of the province having given assurance that it would not cause any injury to the fortifications of the city.
*727 The plaintiffs suppose this the grant under which their ancestor held the land in controversy, and the proceedings contain internal evidence that it was the nearest private grant to the city which was made.
By an inspection of the plan of the city and its fortifications, dated the 29th of May, 1724, and made by Depanger, the Engineer of the Colony, it will be seen that the city was at that period laid off into parallelograms down to Barracks street. The barracks were established at the corner of that and Levee street. The river making a turn there, the fortifications were adjoining below and in advance of the city. By comparing this plan with the site of the square in controversy, it will be seen that the square is entirely within not only the esplanade of the fortifications, but within the exterior line of the fortifications themselves, and is evidently left vacant and appropriated for the fortifications and defence of the city. It is palpable, therefore, that it was not granted to Da Chavannes.
We have reason to believe this line of fortifications was not abandoned, but was maintained and enlarged from time to time, until the treaty of peace between France and Great Britain in 1763, when the Province was ceded to Spain. It is matter of history that Perrier, the Commandant General of Louisiana in 1730, repaired them and surrounded the city with a wide ditch to protect it, as well from the Natchez and other hostile tribes of Indians as from an apprehended insurrection of the slaves, and collected three hundred regular troops and three hundred militia into the adjoiuing barracks at the corner of Barracks and Levee streets. Salmon, his successor, was constantly at war with the Indians.
Bienville, the former military governor who had established the fortifications, returned again as governor in 1734, and brought with him six hundred and fifty regular troops for the defence of the country. During his government he was constantly engaged in war. The Marquis of Vandreuil succeeded him. War existed between France and Great Britain in 1741, continued until Quebec fell aud Canada was conquered; and in 1758, the very year in which the sales, out of which this controversy arises, occurred, Fort Duquesne, the present site of Pittsburgh, was surrendered, and the French garrison came to New Orleans and was quartered by Governor Kerlerec in the barracks in the rear of the same fortifications.
We have no doubt that Governor Kerlerec extended these fortifications not only on the two arpents and twelve toises of land below the barracks, which subsequently became the subject of controversy between the Government and individuals, but so as to encroach on the adjoining plantation, admitted by the Government then as now to be private property. Because a plan of the fortifications was made in 1760 by Deverges, the Engineer of the King, showing the exterior lines of the fortifications encroached upon this private property, and exhibiting four small squares within the fortifications, marked V, which were to have been given to the owner of the plantation as an indemnity for the encroachment.
But the treaty of peace was made in 1763, the land encroached upon was no longer needed for the defence of the country. Delachaise, the owner, resumed it. His successors possessed it until the cession of the countiy to the United States, by whom it was confirmed to them and laid off and sold by the present Bernard Marigny, as a suburb of this growing city. Therefore, the indemnity was never made, but the squares were ceded or sold by the Government.
We have, therefore, the strongest possible evidence, and which is conclusive on our minds, that the square in controversy was not private property until 1763, *728 but had been owned and actually possessed by the Government for-the fortification and defence of the city from its foundation until that year, being a period of forty-five years.
Notwithstanding the irresistible presumption against the claim of the plaintiffs growing, out of the circumstances to which we have adverted, they have endeavored to infer a title, not only to the square in controversy, but also to a tract of land having two arpents and twelve toises front on the Mississippi river, in which it is embraced from the mortuary proceedings in the succession of their ancestor. They have attempted to do so from a sale made of the plantation belonging to his succession, in the month of November, 1758. The sale was made on the application of the heirs of Villars Dubreuil to sell the whole of his property real and personal. The whole was ordered to be sold without any resei'vation whatsoever, with the approbation of the attorney general of the king. The officer charged on behalf of the heirs, and the tribunal which ordered the" sale of the plantation, advertised it in writing from time to time for two months, as follows : “A plantation of the late Mr. Dubreuil, adjoining on one side the limits of this city, and on the other the plantation of Mr. Amelot, having seven arpents and eighteen toises front by all the depth, to the limits of the Bayou and of Chantilly, together with the principal house and other buildings, a saw-mill running four saws, another mill working pestles, (for hulling rice) attached to the saw-mill, a sugar mill, a brick-yard with two kilns, containing each ninety thousand brick, five large sheds, a negro quarter, and generally all the buildings on the plantation, accessories and appurtenances, in the condition in which they are, and on the further condition that, inasmuch as the greater part of said buildings are constructed upon land which belongs to the king, and which he has reserved to himself, which land is not comprised in the above mentioned seven ai'pents and eighteen toises of front, it shall be free to the king to re-take that said portion of land which belongs to him whenever he shall think proper to do so; the purchaser removing previously all the buildings which are seated thereon.”
And on the day of sale Mr. Villars, by direction of the officers of Government, caused it to be proclaimed, and also to be reduced to writing, in the proces verbal of sale, “that to prevent reproaches and contestations on the part of the purchaser, he declares to us, in order to give through us a knowledge to bidders here present, and all others coming from one moment to another, that the house for which we are now receiving bids is situated upon land of the king, as well as all the other buildings between it and the city : and that it is only in consideration of Mr. Dubreuil, his father, that his majesty had consented to the enjoyment on the part of the said Mr. Dubreuil of two arpents and twelve toises, upon which are built the buildings above mentioned ; which two arpents and twelve toises became consequently, in passing into other hands, subject to be re-taken by his majesty, at the will of the ordonateurs of this Province, upon their permitting the purchaser to take away the buildings which are situated upon the same.” Mr. Delachaise became the purchaser, and with the heirs of Villars and officers of the Government signed the proces verbal of sale containing still another clause, “obliging himself to take away the buildings which are on the land of the Icing, in case he be ordered to do so.”
These proceedings, so far from showing that the land in controversy, or the two arpents and twelve toises embracing it, belonged to the deceased, show the contrary conclusively. The advertisement, as well as the declaration of Villars Dubreuil proclaimed to the bidders and reduced to writing in the proces verbal of sale, and not only approved but directed by the officers of the Government, *729 declare in terms that the land belonged to the king and not to the deceased, because the king had reserved it for himself. The manifest interpretation of the advertisement and declaration is, (if they admit of interpretation,) that the king, in granting the adjoining tract, had not granted these two arpents and twelve toises, but had reserved them for his fortifications and the defence of the city.
The argument of counsel is, that the French concessions of land were made upon the condition that the king might resume what was necessary for fortifications, and the enunciation in the sale was made in reference to that condition. But this argument assumes that it was the condition of the whole grant, because it was usual in all French concessions. Why then was not this announced to be the condition upon which the whole tract was sold ? Why was the enunciation of the condition limited to two arpents and twelve toises, when it was applicable to the whole seven arpents and eighteen toises ? Why was the condition enounced at all, since it has never been customary in either public or private sales subsequent to the grant upon that condition?
The plain import of the whole proceeding is, that the vendor was selling a tract of land with improvements, and at the same time was selling some buildings on an adjacent tract of land that belonged to the king, and which had not been conceded by him. The reason it had not been granted we have shown was palpable at the time, because, 1st, it had been dedicated from its foundation as commons of the city ; and 2nd, was always indispensable to the defence of the city, being the esplanade of its fortifications.
Why then, it will be asked, was it occupied by Dubreuil Villars with houses ? It appears in evidence that he was the undertaker and builder of the fortifications for the king, and nothing was more natural than that the king’s'officers should permit him to have his dwelling, and perhaps carpenter’s shop, on the ground reserved for the use of the fortifications, upon condition of removing them whenever required. . The removal would only be required in case an attack or siege was anticipated, which might not occur in a lifetime.
Therefore, the heirs of Dubreuil Villars who sold, and the officers of government who superintended the sale, caused it to be published and then reduced to writing in a prods verbal, and then to be proclaimed orally before the sale, in order, as they say, to prevent reproaches and contestations on behalf of the purchaser, and to give full information to the bidders and all others, that the dwelling house and some other buildings offered for sale was situated, not on land which the king might resume for the fortifications, but on land belonging to the king; on land, it is further stated, reserved by the king, that is, not conceded, but reserved for his fortifications. Dubreuil Villars further stated that it was only in consideration of Mr. Dubreuil, his father, that his majesty had consented to the enjoyment on the part of Mr. Dubreuil of two arpents and twelve toises, on which are built the buildings mentioned; which two arpents and twelve toises became consequently, in passing into other hands, subject to be re-taken by his majesty at the will of the ordanateur of the Province, permitting the purchaser to take away the buildings which are situated upon the same.
No language, it appears to us, could have expressed in stronger terms that the land did not belong to the succession, but that it belonged to the king; and indeed it declared that the possession of the late Dubreuil Villars was of the most precarious character, being held by him only on account of the high consideration entertained for him by the king: and therefore clearly implies that his succession had no possession at all of the land, but only of the houses.
*730 We have adverted to the history of the French fortifications until the peace of 1763. During the next thirty years they fell into disuse, and individuals encroached upon the esplanade. And in 1789, Col. St. Maxent sold the two arpents and twelve toises, with his plantation, to Laurent Sigur. In 1794, the Baron Carondelet surrounded the city with new fortifications, in which he was aided by Laveau Trudeau, the Surveyor General of the Province. The angles of the fort, like those of the French fortifications, encroached beyond the two arpents and twelve toises on what was indisputably private property. Trudeau, in looking at Sigur’s bill of sale, and the line of fortifications as laid off by JDuverges in 1760, which did encroach on private property and for which indemnification was to have been given, momentarily supposed that the two arpents and twelve toises belonged to Sigur, and that he was entitled to indemnification, and Sigur made a claim for it from the Spanish Government.
And here it is proper to observe that, if there was ever any pretence that this land was private properly, the pretence belonged to Laurent Sigur, and not to the.heirs of Dubreuil Villars. For the district judge has demonstrated that if they sold a certain quantify of land by measurement, they sold seven arpents and eighteen toises, all that they ever possessed; and if they sold by metes and bounds per aversionem, they sold to their extreme boundaries, and parted with all their interest. So that the claim of the plaintiffs is utterly unfounded, even if their ancestor ever had any claim to the land.
In consequence of the demand of Laurent Sigur for indemnification in 1797, Gayoso De Lemos, then Governor of Louisiana, caused a thorough investigation to be made in order to ascertain the true line between Sigur’s property and that belonging to the king. It was made in presence of persons of note, appointed on behalf of the Cabildo, in presence of Sigur, of course, and conducted by Laveau Trudeau, the Surveyor General of the Province. After much examination, the line between the city and the plantation was ascertained and fixed at two arpents and twelve toises below Barracks street, about as neai'ly as we can judge one hundred feet below Esplanade street. Much notoriety was given to the proceedings; the line was established with great formality, and was subsequently known as Gayoso’s Line. And the governor rejected the claim of Sigur for damages, on the ground that “ neither he nor the persons from whom he held could have acquired any right on the ground within the lines of the old fortifications although through error, inattention or indulgence, they might have been suffered to possess it. That with regard to the angles of Fort St. Charles, which might exceed the old fortifications, the plaintiff could not have a better title to an indemnity from the Government, because in all concessions made under the French Government, the king had always reserved the right of taking out of the lands granted the ground necessary for extending the fortifications of the city ; a right to which the King of Spain had succeeded.”
As the governor was charged with the exercise of judicial as well as executive powers, this was a decision absolutely binding upon the claimant of the land. The present Bernard Marigny, who subsequently became the proprietor of the plantation, considered it so, and claimed before the American board of commissioners for the adjustment of land titles only to Gayoso’s Line, and was confirmed to that extent and no further.
In consequence of the decision of the Spanish governor, Laurent Sigur refused to pay to the syndics of Col. St. Maxent, the whole price he had agreed to give for the plantation, on the ground that two arpents and twelve toises of the same belonged to the public and not to his vendor. He sued the syndics of St. *731 Maxent for a proportional diminution of the price. This was the great occasion when all the old titles and plans were still in existence, also even living witnesses, and every means of ascertaining the exact truth, and when private interest to a. large amount would have established the private right to the two arpents and twelve toises, if it had been possible. The contrary was established in the suit beyond ail doubt. The proces verbal of the sale of Dubreuil Villars’ succsssion was discovered, given in evidence, and in the absence of grant or title was considered conclusive. And in 1800, the tribunal determined that a diminution of the price should be allowed to Sigur, for the two arpents and twelve toises, because, as they declare, that portion of the property “ did not belong to Col. St. Maxent when he sold it, and for the possession of which he had no title. A diminution of $25,000 was allowed on the price of the purchase, or about $10,000 the front arpent.
The judgment was not executed until after the cession of the country to the United States, and the suit was renewed before the Superior Court of the Territory of Orleans. It was contested by the ablest counsel in the Territory on each side ; for it seemed to be considered that the merits were still open to investigation, and they were again decided by the late Judge Martin adversely to the plaintiffs’ pretensions in this cause. The counsel used an argument before the Superior Court as to the declaration of Dubreuil Villars in 1758, which might be used on the present occasion if that declaration admitted of the least possible doubt, that “ verba fortius accepiuntur contra proferentem." We advert to it here because we are approaching the opinion expressed by one of the commissioners for the adjustment of land titles in Louisiana — the unfortunate expression of which gave rise to this long and expensive litigation. It is strange, however, that it should have given rise to this suit on behalf of the heirs of Villars, since the opinion was expressed in favor of the creditors of Col. St. Maxent, who, with those under whom they claimed, had held all' the rights of Villars’ succossion by perfect titles for sixty years.
The commissioner considered that as Dubreuil Villars occupied the two arpents and twelve toises as part of his plantation, and as French concessions contained a reservation that the King might take any part of the land granted for fortifications when he deemed it necessary, it might be inferred from the declaration of Villars that the king had granted the land with this reservation, and so he concluded. We have sufficiently refuted this view of the subject.
But the commissioner gave as another reason, the improbability that Villars would have erected his dwelling house and established other improvements on the land unless it had been granted. As he was the undertaker of the fortifications, it is probable his principal establishment was the saw-mill mentioned in the proces verbal of sale, and it is certain it was on what has since been called Marigny’s Canal. The sugar-mill mentioned was probably at the same place, and not very valuable either, as until this suit it had been forgotten that sugar was cultivated in the Colony at that early period, and thought that it was introduced thirty years afterwards by the late Mr. Boré. That his dwelling house, and probably carpenter’s shop, was nearer the fortifications he was erecting, and on the two arpents and twelve toises of land belonging to the king, cannot be disputed under the declaration of his son. Neither the character nor value of these buildings are shown, and we may reasonably conclude that they were of the most ordinary character, on account of the precarious possession of the place where they were erected ; being directly in the fire of a fort during a war that had existed between France and England for seven years. *732 Charlevoix, in passing through the Colony, described the city as a collection of huts. The bubble of Law having, at a later period of the colonial history, exploded with all its misfortunes, and the Colony being constantly engaged in wars, it is not likely that it improved much previously to 1758. Indeed, Voltaire, alluding to the explosion of Law's bubble, describes the city. The existence of these buildings, under the circumstances, should have created no doubt as to the meaning of the declarations of Dubreuil Villars, which was explicit; but if they admitted of any doubt from any extraneous circumstances, “ contra proferentem,, verba fortius acccpiuntur."
The claim was not confirmed by the Commissioners nor by the Government of the United States. On the contrary, the United States, by three acts of Congress in 1807, 1811, and 1822, confirmed it to the city of New Orleans; which confirmation was equivalent to a grant, since they had never been conceded to individuals. And further, in the case of The United States v. The City of New Orleans, the Supreme Court of the United States determined that property in the same situation precisely belonged to the city.
The fort, occupying the greater part of the square in controversy, continued in the possession of the General Government and greatly aided in the ever memorable defence of the city against the invasion of 1814. With the return of peace the fort was dismantled, the works razed, and the square was subsequently donated by the city to the United States for the establishment of a mint, which has been done at vast expense and with great advantage to the city.
But much of this investigation was unnecessary, except to show that every pretence of the plaintiffs had been carefully examined and considered by the court. For, bearing in mind the military history of the country, a simple inspection of the original fortifications of the city by the French Government in 1724, as exhibited in the plan of Depanger, their engineer; their fortifications ns rebuilt in 1760, and exhibited by the plan of Deverges’, the fortifications erected by the Baron Carondelct in 1794, and exhibited by the plan of Laveau Trudeau, the Surveyor General of the Province; and the plans of Fort St. Charles, as possessed under the American Government; and the recollection of its actual site by many now living, shows that all these fortifications were situated on the very square which is the object of this suit. It will thus be seen that the square has been occupied for fortifications from the time Governor Bienville planted his Colony on the banks of the Mississippi until they were erased after the treaty of peace with Great Britain in 1815.
It was never granted or held as private property; was originally destined by the sovereign to the defence of the city ; and situated on the commons dedicated at its foundations to its use. This particular square had therefore been actually possessed and used by the public for these purposes for more than a hundred years before the institution of this suit, and never was possessed a day as private.
It was stated ia the argument, and indeed it appears by the record, that the suit is supported by distinguished names from other States. And it may be useful to mention here, that suits of the kind have given trouble and anxiety and have caused great expense in this State, with little profit to the plaintiffs, so as to have induced our Legislature to reduce the term of prescription in favor of the titles to real property, even as to non-residents, to ten years; and to manifest a strong disposition by other legislation to protect the bond fide possessors of property in this State, as far as they possibly can, consistently with justice and equity. The experience of this court has deeply impressed ús with the necessity of this legislation.
*733 Therefore, in conclusion, we have to say, that this is a petitory action brought against the United States, who possess the property sued for with a just title and in good faith ; that it is brought without grant, title, or the shadow of equity to support it; and strange to say, is principally based upon an express declaration of the ancestor of the plaintiffs, that he had no title whatsoever, but that it belonged to his sovereign, by whose favor alone his father, out of considerations personal to him, had possessed it, and that therefore he sold only the right of removing his buildings from it. Further, the suit is not only barred by the prescription of ten years, but by an actual adverse possession in good faith for more than a century.
The judgment of the district court is therefore affirmed, with costs.